UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSE ARREOLA,

Plaintiff,

v.

ANDREW POMAZAL, et al.,

Defendants.

No. 2:15-cv-1179 JAM DB P

FINDINGS AND RECOMMENDATIONS

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action under 42 U.S.C. § 1983. Plaintiff alleges defendants Lankford and Pomazal were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Before the court are defendants' motions for summary judgment. For the reasons set forth below, the undersigned recommends both motions be denied.

## BACKGROUND

### I. Allegations in the Complaint

This case is proceeding on plaintiff's complaint filed here on May 28, 2015. (ECF No. 1.) Plaintiff alleges that he underwent back surgery and was subsequently sent to High Desert State Prison ("HDSP") for treatment for an infection which included the intravenous administration of drugs. According to plaintiff, he arrived at HDSP with specific orders from his surgeon for pain medication, but on the following day defendant Dr. Pomazal did not provide such pain

medication to him. Plaintiff further alleges that all of his pain medications were discontinued while he was at HDSP. Plaintiff alleges that he saw defendant Dr. Lankford and complained about not receiving his pain medication during the inmate appeals process, but that Dr. Lankford rudely stated "what else do you want morphine or some heroin?" and did not assist him in any way. (Compl. (ECF No. 1) at 3 and attachments.)

**II. Procedural Background**

While plaintiff named four defendants in his complaint, on screening the court found plaintiff stated cognizable claims against only Drs. Lankford and Pomazal. (Oct. 9, 2015 Order (ECF No. 7).) On February 2, 2016, defendants answered the complaint. (ECF No. 14.) On March 21, 2017, defendant Lankford filed a summary judgment motion ("Lankford MSJ"). (ECF No. 37.) On April 3, 2017, defendant Pomazal filed a summary judgment motion ("Pomazal MSJ"). (ECF No. 38.) On May 1, 2017, plaintiff filed an opposition to defendant Pomazal's motion (ECF No. 39), and on July 17, 2017 filed an opposition to defendant Lankford's motion (ECF No. 42). On May 8, 2017, Pomazal filed a reply. (ECF No. 40.) On July 19, 2017, Lankford filed his reply. (ECF No. 43.)

**MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff contends that he was sent to HDSP for the purpose of receiving intravenous ("IV") treatment for an infection, not for the purpose of adjusting his medications. Plaintiff states that defendant Pomazal prescribed inadequate pain medication and defendant Lankford failed to correct the problem when plaintiff filed an appeal.

Defendant Pomazal argues he followed accepted medical standards when he weaned plaintiff off morphine and prescribed non-narcotic pain medications for plaintiff's back pain. In his motion, defendant Lankford argues he was not deliberately indifferent to plaintiff's medical needs when he denied plaintiff's appeal in which plaintiff sought narcotic pain relief or a transfer back to Mule Creek State Prison ("MCSP").

////

////

////

## I. Legal Standards

### A. Summary Judgment Standards under Rule 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.). See also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party typically may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of

affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

////

////

////

////

**B. Other Applicable Legal Standards**

**1. Civil Rights Act Pursuant to 42 U.S.C. § 1983**

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of §1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

**2. Deliberate Indifference under the Eighth Amendment**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319.

What is needed to show unnecessary and wanton infliction of pain "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Whitley, 475 U.S. at 320). In order to prevail on a claim of cruel and unusual punishment, however, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

If a prisoner's Eighth Amendment claim arises in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. See Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter

Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**3. Liability for Reviewing Appeals**

Generally, denying a prisoner's administrative appeal does not cause or contribute to the underlying violation. See George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007); Hernandez v. Cate, 918 F. Supp. 2d 987, 1018 (C.D. Cal. 2013). The review assessment of a correctional medical official may constitute deliberate indifference only if the official was aware that the underlying challenged medical decision caused plaintiff "further significant injury or the unnecessary and wanton infliction of pain," and the official purposefully failed to pursue an appropriate medical remedy. Farmer, 511 U.S. at 842; see also Jett, 439 F.3d at 1098 (prison

officials, particularly those in administrative positions, may be "liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help"). This rule is especially true where the reviewer is medically trained. See, e.g., Thomas v. Nangalama, No. 2:10-cv-1295 JAM EFB P, 2013 WL 1281792, *7 (E.D. Cal. Mar. 26, 2013), findings and recos. adopted, 2013 WL 1800344 (E.D. Cal. Apr. 29, 2013); Pogue v. Igbinosa, No. 1:07-cv-1577 GMS, 2012 WL 603230 (E.D. Cal. Feb. 23, 2012) (medically-trained individuals who are made aware of serious medical needs through reviewing a prisoner's grievance may be liable for failure to treat those needs).

**4. Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v. Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in sequence). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). The existence of triable issues of fact as to whether prison officials were deliberately indifferent does not necessarily preclude qualified immunity. Estate of Ford v. Ramirez–Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).

**II. Material Facts**

Both defendants filed Statements of Undisputed Facts ("Lankford SUF" and "Pomazal SUF") as required by Local Rule 260(a). (ECF Nos. 37 at 12-14; 38-2.) Plaintiff's filings in opposition to defendants' motions for summary judgment fail to comply with Local Rule 260(b). Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and

deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." Plaintiff filed just two-page briefs and one exhibit in opposition to both defendants' motions. (ECF Nos. 39, 42.) In both opposition documents, plaintiff states that he is relying on the sworn statements made in his complaint. (ECF No. 39 at 1; ECF No. 42 at 1.)

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to discern whether he denies any material fact asserted in defendants' SUFs. The court finds two issues of disputed material fact. They are discussed below in section B. Below in section A, the court sets out the material facts that appear to be undisputed.

**A. Undisputed Material Facts**

The events which are the subject of plaintiff's complaint occurred in 2013 at HDSP. At that time, defendants Pomazal and Lankford were employed by the California Department of Corrections and Rehabilitation ("CDCR") as physicians at HDSP. (Pomazal SUF #2 (ECF No. 38-2 at 1); Lankford SUF #3 (ECF No. 37 at 12).)

On May 16, plaintiff had back surgery at San Joaquin General Hospital. (Pomazal SUF #12.) While recovering at the hospital, plaintiff was given morphine for pain. (Id. #13.) Before leaving the hospital, plaintiff acquired a methicillin-sensitive Staphylococcus aureus bacteremia infection at the site of the surgery. (Id. #14.) Plaintiff was treated for the infection and then discharged to HDSP on June 6. (Id. #15.) Plaintiff was to be treated for six weeks at HDSP with intravenous antibiotics. (Id.)

Plaintiff's medical records show that after his surgery on May 16, he was originally supposed to be returned to MCSP on May 21. (Plaintiff's Medical Records ("Med. Records"), Ex. 14 to Pomazal MSJ (ECF No. 38-4 at 70-72).) According to a "TRANSFER SUMMARY" prepared by the hospital, at that time, just five days after surgery, plaintiff was receiving 30 mg. of Morphine in the morning and 50 m.g. at noon each day. (Id. at 72.) The summary states that plaintiff's "[p]ain is well-controlled with morphine." (Id.) The summary further states, "Continue all medication on transfer." (Id.) Plaintiff was not transferred to MCSP.

////

A second transfer summary was prepared on June 4 for plaintiff's transfer, scheduled for that day, to HDSP. (Id. at 59-62.) That summary stated that plaintiff's "[p]ain was well-controlled with p.o. morphine." (Id. at 62.) The summary also described the bacterial infection which was detected on May 29, 2013. (Id.) The summary listed plaintiff's "MEDICATIONS ON TRANSFER" which included a "Nafcillin" drip for the infection and "Morphine extended-release 30 mg p.o. q.a.m. and 30 mg p.o. q.p.m.[1]" (Id. at 61-62.) In the "RECOMMENDATIONS" section of the transfer summary, HDSP was instructed to, among other things, continue the Nafcillin drip for six weeks and provide physical therapy "three times a day for the next few weeks." There were no recommendations provided regarding pain medications.

An addendum to the original transfer summary was prepared two days later, on June 6, because transportation problems caused a delay in plaintiff's transfer. (See id. at 68-69.) Under the heading "DISCHARGE MEDICATIONS," the doctor noted that the medication Lisinopril had been discontinued but the "[r]est of the medications the same as prior." (Id. at 69.) The recommendations were the "[s]ame as the previous transfer summary." (Id.)

Plaintiff's medication records show that on June 7, the day after plaintiff arrived at HDSP, Dr. Pomazal ordered plaintiff to be weaned from Morphine and prescribed 15 mg Morphine in the a.m. and 15 mg in the p.m. for ten days and injections of Toradol once a day for three days.[2] (Id. at 76; Mar. 30, 2017 Decl. of Andrew Pomazal ("Pomazal Decl."), Ex. 10 to Pomazal MSJ, ¶ 12 (ECF No. 38-4 at 23-24).)

In a June 10 note to plaintiff's medical file, Dr. Pomazal stated that plaintiff wanted morphine and noted that morphine is "inappropriate for chronic pain management." (Med. Records (ECF No. 38-4 at 77).) Pomazal also wrote that plaintiff's "pain is not reflected in his outward presentation." (Id.)

////

[1] The abbreviation "p.o." means the medication is to be taken orally, "q.a.m." means the medication is to be taken every morning, and "q.p.m." means the medication is to be taken every evening. See http://www.medicinenet.com/common_medical_abbreviations_and_terms.

[2] Toradol is a prescribed nonsteroidal anti-inflammatory drug ("NSAID"). (Pomazal Decl. ¶ 12 (ECF No. 38-4 at 24).)

Plaintiff filed a health care appeal on June 16 in which he complained about the lack of pain medication for his back. Plaintiff stated that he had arrived at HDSP with orders of 30 mg of Morphine twice a day with "breakthrough meds. of Percocet every eight hours as needed." (Attachment to Compl. (ECF No. 1 at 7).) However, Dr. Pomazal prescribed 15 mg of Morphine. When plaintiff saw Dr. Pomazal, he told him the 15 mg of Morphine was not "covering the extreme pain" and described how bad his pain was. (Id.) Plaintiff wrote that "all he added was Tylenol." (Id.) Plaintiff asked that his pain medication be restored to the 30 mg of Morphine twice a day and Percocet every eight hours. Plaintiff also asked to be transferred to MCSP. (Id. at 5, 7.)

On June 20, Dr. Lankford interviewed plaintiff regarding his appeal. (Lankford SUF #6 (ECF No. 37 at 13).) The first level response to plaintiff's appeal is dated July 29. (Attachment to Compl. (ECF No. 1 at 9).) It states that:

> Dr. Lankford has conducted an evaluation of your medical condition and noted that there is no medical indication for you to be on morphine and Percocet as you are currently receiving NSAIDS. There also was no medical indication for you to be transferred as you are in the middle of treatment.

(Id.)

In a medical progress note dated June 24, plaintiff was seen by Dr. Abdur-Rahman for complaints of back pain. (Med. Records (ECF No. 38-4 at 78).) It was noted that plaintiff had been on "30 mg. of morphine ER b.i.d.[3]" (Id.) The note continued: "That was tapered and he is currently on plain Tylenol." Two days later, plaintiff was seen again by Dr. Abdur-Rahman for back pain. (Id. at 79.) It was noted that plaintiff's pain had improved since his prescription was changed to Tylenol with Codeine. (Id.) While not clear from the records provided, the court can infer that Dr. Abdur-Rahman prescribed Tylenol with codeine at the June 24 appointment.[4] The

////

[3] The court assumes "ER" stands for extended release, which other records show was the morphine formulation prescribed for plaintiff. The abbreviation "b.i.d." means twice a day. See http://www.medicinenet.com/script/main/art.asp?articlekey=6954

[4] The lodged copy of the "medical progress note" prepared by Dr. Abdur-Rahman regarding the June 24 appointment appears to be missing the second page. (See ECF No. 38-4 at 78.)

doctor's recommendation was to "[c]ontinue nonsteroidal anti-inflammatory drugs p.r.n. chronic pain.[5]" (Id. at 80.)

Dr. Pomazal next saw plaintiff on July 1. (Id. at 81.) His notes state that plaintiff was still withdrawing from "morphine/narco." (Ex. 3 to Pomazal MSJ (ECF No. 38-4 at 6).) While not legible in the medical record, Dr. Pomazal states that he gave plaintiff a Toradol injection that day for additional pain relief. (Pomazal Decl. ¶ 14 (ECF No. 38-4 at 25).) He saw plaintiff again on July 3, July 10, July 15, July 17, and July 18. (Med. Records (ECF No. 38-4 at 82-86).) At each visit, plaintiff complained of pain. In his declaration, Dr. Pomazal states that while plaintiff complained of pain, he was not in "acute distress" during those visits. (Pomazal Decl. ¶¶ 15-19 (ECF No. 38-4 at 25-27).) At some visits, plaintiff asked for narcotics. Pomazal stated that at the July 3 appointment, he felt the Tylenol with Codeine was adequate and that plaintiff "would be best served by use of other means of chronic pain relief." (Id. ¶ 15.) At the July 8 appointment, Pomazal stated that he "continued to believe that [plaintiff] would be best served by use of other means of chronic pain relief and thought that NSAIDs and exercise would produce the best long-term results." (Id. ¶ 16.) Plaintiff continued to be prescribed Tylenol with codeine through the July 15 appointment. (Id. ¶¶ 17, 18.) When Pomazal saw plaintiff on July 17, Pomazal "saw no evidence of pain interfering with normal movement." He felt the pain management plan in place for plaintiff was "appropriate at that time." (Id. ¶ 19.)

On July 22, plaintiff was again seen by Dr. Abdur-Rahman for back pain. (Med. Records (ECF No. 38-4 at 87).) The doctor's notes state that plaintiff had "apparently finished the Tylenol with Codeine that he had been taking." (Id.) The notes state that plaintiff was awaiting transfer. Plaintiff was transferred from HDSP to MCSP on July 23, 2013. (Pomazal SUF #20 (ECF No. 38-2 at 3).)

////

---

[5] The abbreviation "p.r.n." means "when necessary." See http://www.medicinenet.com/script/main/art.asp?articlekey=8309. The court also notes that Tylenol with codeine does not appear to be in the drug class referred to as NSAIDs. See https://www.drugs.com/answers/tylenol-nsaid-3002124.html. It is not clear what medication Dr. Abdur-Rahman is referring to when he referenced NSAIDs.

Plaintiff's medical file also contains a letter from Dr. Gregorius of San Joaquin General Hospital regarding a consultation on August 6, 2013. (Med. Records (ECF No. 38-4 at 57-58).) Dr. Gregorius expressed concern about plaintiff's pain control. Gregorius stated:

> I am usually reluctant to offer any opinion as to patients' pain management with the correctional facilities because the physicians at the correctional facility generally provide pain medication for patients as to their best ability. However, in this particular case I cannot understand why this inmate has been given only Tylenol when it has been necessary for schedule II narcotics to control his pain up until and after his present surgery. I would strongly urge the physicians involved in this patient's care at the facility at which he resides to consider a stronger medication for his pain which is extremely disabling to him.

(Id. at 57.)

**B. Disputed Material Facts**

**1. Dr. Pomazal's Authority to Change Pain Medication**

Plaintiff contends Dr. Pomazal had no authority to change his pain medication. Dr. Pomazal states that the hospital's transfer order simply lists the drugs the patient is taking. (Pomazal Decl. ¶ 12 (ECF No. 38-4 at 24).) He opined that "[n]o discharging physician intends by his or her order to prescribe medication for the patient to take for the rest of his or her life. Transfer orders are a way to ensure continuity of medications until the patient can be evaluated by a physician." (Id.)

Nothing in the evidence before the court disputes Dr. Pomazal's assertion. Plaintiff's medical records from San Joaquin General Hospital show no expectation by doctors there that plaintiff's pain medications would remain the same. In fact, the records indicate the opposite was true. In the transfer summary prepared by hospital staff on May 21, the date plaintiff was originally supposed to be returned to custody, prison doctors were directed to "[c]ontinue all medication on transfer." (Med. Records (ECF No. 38-4 at 72).) However, the transfer summary provided to the prison when plaintiff was transferred to HDSP on June 6 contains no similar direction. The summary lists plaintiff's medications and provides recommendations with respect to some; but it contains no recommendation or direction regarding pain management. (Id. at 59-69.) Plaintiff

////

fails to show any genuine issue of fact regarding Dr. Pomazal's authority to change his pain medications when he arrived at HDSP.

**2. Prescription for Tylenol**

The medical record provided does not show when plaintiff was prescribed plain Tylenol or by whom. As best the court can determine, plaintiff took the tapering dose of 15 mg. Morphine from June 7 through June 16. However, at some point, plaintiff was prescribed plain Tylenol. In his June 16 appeal, plaintiff states that Dr. Pomazal prescribed the Tylenol. (See Attachment to Compl. (ECF No. 1 at 7).) However, neither Dr. Pomazal's declaration nor the medical records that have been provided show that prescription. To add to the lack of clarity, the first level response to plaintiff's appeal states that Dr. Lankford felt "there is no medical indication for you to be on morphine and Percocet as you are currently receiving NSAIDS." (Id. at 9.) It appears that when Dr. Lankford saw plaintiff on June 20, plaintiff was taking only Tylenol. Nothing in the record shows that Tylenol is an NSAID and the court's own research indicates that it is not. (See n. 5, supra.)

**III. Analysis of Eighth Amendment Claims**

**A. Liability of Dr. Pomazal**

In his declaration, Dr. Pomazal states that he ordered plaintiff to be weaned from Morphine on June 7 because he felt at that point, twenty-one days after plaintiff's back surgery, plaintiff should be transitioning to less dangerous forms of pain relief. (Pomazal Decl. ¶ 12 (ECF No. 38-4 at 23-24).) In addition to the reduction in Morphine, Dr. Pomazal prescribed plaintiff Toradol injections once a day for three days to help with the pain. (Id.) Toradol is a prescribed NSAID. (Id.)

Dr. Pomazal recalled plaintiff asking for narcotics at the June 10 appointment. (Id. ¶ 13.) Dr. Pomazal felt that plaintiff did not appear to be in severe pain and thought it was "too early to abandon the effort to wean him from narcotics" because the then-current pain management plan had "long-term benefit." (Id.)

The court finds there is no genuine dispute of material fact regarding Dr. Pomazal's decision to wean plaintiff off Morphine. Dr. Pomazal's declaration, and plaintiff's medical

records, show that Dr. Pomazal exercised reasonable medical judgment to determine that it was in plaintiff's best interests to discontinue narcotic pain relievers. Doctors' decisions to discontinue narcotics or opioids in favor of safer medications have been found medically acceptable in other cases in this court. See e.g., Montiel v. Taher–Pour, No. 1:11cv2145 LJO DLB PC, 2014 WL 2574533 (E.D. Cal. June 09, 2014), findings and recos. adopted, 2014 WL 3615801 (E.D. Cal. July 22, 2014) (granting defendants' motion for summary judgment on plaintiff's Eighth Amendment claim challenging abrupt discontinuance of Tramadol and four-day taper of Gabapentin, with the use of an alternative prescription for ibuprofen); Solomon v. Negrete, No. 2:10–cv–2103 WBS AC P, 2014 WL 546367 (E.D. Cal. Feb.11, 2014), findings and recos. adopted, 2014 WL 1024567 (E.D. Cal. Mar.14, 2014) (granting defendant's motion for summary judgment on plaintiff's Eighth Amendment claim challenging the discontinuance of a morphine prescription, then tapering of Tramadol and Gabapentin over one-week period, with the use of an alternate prescription for ibuprofen); Fischer v. Algers, No. 2:12–cv-2595 MCE CKD P, 2014 WL 3385184 (E.D. Cal. July 10, 2014) (recommending defendants' motion for summary judgment be granted on plaintiff's Eighth Amendment claim challenging his taper by prison medical staff from morphine, to Tylenol 3 with codeine, to ibuprofen), findings and recos. adopted, No. 2:12-cv-2595 MCE CKD P (E.D. Cal. Aug. 15, 2014).

The record indicates that Dr. Pomazal prescribed plaintiff plain Tylenol to take after he was weaned off Morphine.[6] More importantly, the record contains no basis for Dr. Pomazal's

[6] The court recognizes that the only evidence supporting the fact that Dr. Pomazal was responsible for the Tylenol prescription is the statement plaintiff made in his health care appeal. The court construes pro se filings liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). And, the court may consider evidence that would not be admissible per se on summary judgment, particularly in opposition to a motion for summary judgment. See Fraser v. Goodale, 342 F. 3d 1032, 1036 (9th Cir. 2003) (even if form of the evidence is objectionable, court should consider a pro se party's evidence if the substance could be made use of at trial; evidence does not have to be admissible per se to be considered on summary judgment); Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (on summary judgment, the non-moving party's evidence need not be in a form that is admissible at trial) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)); but see Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002) (unauthenticated documents submitted by plaintiff who was represented by counsel cannot be considered in opposition to a motion for summary judgment). This is not a situation in which plaintiff attempts to rely on unverified

apparent decision that plain Tylenol was appropriate to manage plaintiff's pain when he stopped taking Morphine.

Plaintiff's medical records provided by defendants do not appear to be complete. On the evidence provided, the court is unable to determine whether Dr. Pomazal's decision to treat plaintiff with plain Tylenol was "medically unacceptable under the circumstances," and whether he "chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332 (citations omitted); see also Toguchi, 391 F.3d at 1058.

Plaintiff's medical records do show that both Drs. Abdur-Rahman and Pomazal exercised their medical judgment in keeping plaintiff on Tylenol with codeine. The only evidence plaintiff has presented that the treatment of his pain symptoms with Tylenol with codeine was medically unacceptable under these circumstances is the August 2013 letter from Dr. Gregorius that he felt plaintiff's pain was "extremely disabling" and required treatment with narcotics. However, "[a] plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." Jackson, 90 F.3d at 332 (citing Sanchez, 891 F.2d at 242). Further, Dr. Gregorius notes that plaintiff was then receiving only Tylenol for his pain. The evidence shows that at least through July 15, a week before plaintiff's transfer from HDSP, plaintiff was receiving Tylenol with codeine. Plaintiff left HDSP on July 22. Dr. Gregorius saw plaintiff over two weeks later on August 6. The fact that, at that point, plaintiff's new prison was providing him only Tylenol, which Dr. Gregorius found insufficient, does not mean plaintiff's pain management plan two weeks earlier at HDSP was inadequate. Moreover, nothing in the record shows that plaintiff saw Dr. Pomazal after July 15. Therefore, any medication decisions made after that time cannot be attributed to him.

The court thus considers plaintiff's pain management care at HDSP during three time periods. The first starts with plaintiff's admission to HDSP on June 6 and ends on June 16, the

---

information from a third party. Plaintiff has personal knowledge of the information. Therefore, if this matter was to go to trial, plaintiff could testify to the matters stated in his health care appeal. For these reasons, the court will accept plaintiff's statement that Dr. Pomazal was responsible for the Tylenol prescription for purposes of these summary judgment motions.

last day, according to the record, plaintiff received Morphine. The second time period is June 17 through June 24. During this time period it appears plaintiff was prescribed only plain Tylenol for his back pain. The third time period is June 24 through plaintiff's transfer out of HDSP. During at least part of this time, plaintiff was prescribed Tylenol with codeine. While that prescription appears to have lapsed by the time plaintiff left HDSP, there is no showing in the record that defendants bore any responsibility for the discontinuation of that medication.

For the first and third time periods, plaintiff's challenge to the pain management medications he received at HDSP amounts to no more than plaintiff's difference of opinion with defendant Dr. Pomazal regarding the pain medication he should receive. Plaintiff does not have a right to dictate what medications he will be prescribed. Stiltner v. Rhay, 371 F.2d 420, 421 n.3 (9th Cir. 1967) ("[P]laintiff's allegations show only that he has not been receiving the kind and quality of medical treatment he believes is indicated. Like the Seventh Circuit, 'we know of no authority standing for the proposition that such a claim as plaintiff attempts to assert here is cognizable under the Federal Civil Rights Act.'" (quoting United States v. Ragen, 323 F.2d 410, 412 (7th Cir. 1963))); United States v. McGinnis, 429 F.2d 864, 867-68 (2nd Cir. 1970) ("'The prisoner's right is to medical care—not the type or scope of medical care which he personally desires.'" (quoting Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. 1968))).

With respect to the second time period, the court finds there is a genuine issue of material fact preventing summary judgment for defendant Pomazal. On the current record, the court cannot determine whether Dr. Pomazal's decision to prescribe Tylenol was medically acceptable.

**B. Liability of Dr. Lankford**

Dr. Lankford interviewed plaintiff on June 20, when he was taking only Tylenol for his pain. Dr. Lankford states that he was entitled to rely on the medical judgment of plaintiff's treating physician. (See Lankford MSJ (ECF No. 37) at 9.) However, as described above, the record does not show what medical judgment was exercised to prescribe plaintiff the Tylenol he was taking at that time. Moreover, Dr. Lankford stated that he denied the appeal, at least in part, because plaintiff was receiving NSAIDs. However, the record is not clear that plaintiff was, in fact, being prescribed NSAIDs at that time. On this record, the court cannot say that Dr.

Lankford's determination that plaintiff's medical care at the time he was interviewed on June 20 was "reasonable under the circumstances" and did not violate the Eighth Amendment.

Particularly because he was medically trained, Dr. Lankford had the ability to determine whether plaintiff was receiving appropriate medical care and address plaintiff's complaint that he was receiving inadequate pain medication. See Rapalo v. Lopez, No. 1:11-cv-1695-LJO-BAM (PC), 2017 WL 931822, at *17 (E.D. Cal. Mar. 9, 2017) (medically-trained individuals who are made aware of serious medical needs through reviewing a prisoner's grievance may be liable for failure to treat those needs); Pogue v. Igbinosa, No. 1:07-cv-1577 GMS, 2012 WL 603230 (E.D. Cal. Feb. 23, 2012) (same). The undersigned finds a genuine issue of material fact about the reasonableness of Dr. Lankford's rejection of plaintiff's appeal.

**IV. Analysis of Qualified Immunity**

The legal contours of plaintiff's Eighth Amendment claim for deliberate indifference to his pain were clearly established in 2013. Defendants should have been aware that pain is a serious medical need, McGuckin, 974 F.2d at 1060, and that failure to treat it would constitute deliberate indifference to a serious medical condition, violating the Eighth Amendment, Saucier, 533 U.S. at 201-02. Further, because defendants have not met their burdens of demonstrating the absence of a genuine issue of material fact with respect to the reasonableness of their conduct in treating plaintiff's pain, summary judgment based on qualified immunity is inappropriate. See Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); see also Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.1993)(if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is not appropriate).

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

1. Defendant Pomazal's motion for summary judgment (ECF No. 38) be denied; and

2. Defendant Lankford's motion for summary judgment (ECF No. 37) be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 24, 2017

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/arre1179.msj